**Continuation of Application**

I, Heather Williamson, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent of the Drug Enforcement Administration ("DEA") and have been so employed since January 2013. I am currently assigned to the Grand Rapids District Office. Previously, I was assigned to the Southwest Border Initiative Group-3 ("SWB-3") and to the Los Angeles Strike Force for approximately six years. The Los Angeles Strike Force is an investigative group jointly led by the DEA and the Federal Bureau of Investigation ("FBI"), and composed of several other federal, state, and local agencies that is focused on the disruption of the Mexico-based Sinaloa Cartel. Prior to working as a DEA Special Agent, I completed 20 weeks of training at the DEA Academy in Quantico, Virginia, which included narcotics identification, detection, trafficking, and interdiction; money laundering techniques; asset identification, seizure, and forfeiture; and techniques used by narcotics traffickers to avoid detection by law enforcement officials. I have investigated drug trafficking organizations for violations of federal laws, including, but not limited to, unlawful importation of controlled substances, distribution of controlled substances, manufacturing controlled substances, and possession with intent to distribute controlled substances, including cocaine, methamphetamine, heroin, fentanyl, and other dangerous drugs, as well as money laundering.

2. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect (lingo) and coded language used by narcotics traffickers.

3. In connection with my duties, I investigate criminal violations of the federal and state controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and offenses involving money laundering, as well as attempt and conspiracy to do the same, in violation of 18 U.S.C. §§ 1956 and 1957.

4. This Affidavit is made for the purpose of establishing probable cause in support of a search warrant for the following:

> **One black safe with lock and key access
> (Subject Item 1"); and**
>
> **One black and gray SentrySafe with electronic keypad access
> ("Subject Item 2")**

for evidence of conspiracy to distribute and possess with the intent distribute controlled substances, in violation of Title 21, United States Code, Section 846;

possession of controlled substances with the intent to distribute them and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); and offenses involving money laundering, as well as attempt and conspiracy to do the same, in violation of 18 United States Code Sections 1956 and 1957. Because this Affidavit is for the limited purpose of establishing probable cause to support the issuance of a search warrant for the proposed items, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and events described in this Affidavit.

5. The statements contained in this Affidavit are based, in part, on: (a) my personal participation in this investigation; (b) information provided by other federal and state law enforcement officers, including Michigan Department of State Police and West Michigan Enforcement Team Officers; (c) review of consensually recorded conversations and conversations intercepted pursuant to court orders authorizing the interception of wire and electronic communications; (d) surveillance reports; (e) criminal history records; (f) information from confidential sources; and (g) my training and experience and the training and experience of other law enforcement agents.

6. Based upon my training, experience, and participation in financial investigative aspects involving large amounts of controlled substances, I am aware of the following:

  a. Drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives,

        associates, or business entities to avoid detection of these assets by government agencies. That traffickers tend to keep records about their assets in their residence and/or in the residences of their associates;

b.     That even though these assets are in names other than the drug traffickers', the traffickers actually own and continue to use these assets, and exercise dominion and control over them;

c.     That drug traffickers often maintain, on hand, and often in their place of residence and/or the residences of their associates, large amounts of currency in order to maintain and finance their on-going narcotics business;

d.     That it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their residences and/or the residences of their associates;

e.     That it is common for drug traffickers to secrete contraband, proceeds, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations which they and/or their associates maintain dominion and control to ensure ready access to these items and to conceal them from law enforcement authorities; that subjects involved in drug trafficking often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns. Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from. Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets;

f.     That in order to accomplish this concealment, drug traffickers have built "stash" places within their residences, vehicles, or businesses for these items. That traffickers may

        also secret items of value in safes or other locked compartments;

g.    That it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds. This evidence includes currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers. These and other items are maintained by the drug traffickers within their residences, businesses, or other locations over which they maintain dominion and control;

h.    That drug traffickers often utilize electronic equipment such as cellular phones, computers, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information. Traffickers maintain these items within their residences, businesses, or other locations over which they maintain dominion and control, including residences and other locations under the control of their associates;

i.    That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations, and business fronts, storage lockers, safe deposit boxes, and otherwise legitimate businesses that generate large quantities of currency. That traffickers also often utilize their proceeds to purchase high value items, including but not necessarily limited to designer clothing, vehicles, and jewelry;

j.    That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

    k.    That it is common for drug traffickers to separate their "street money" by denomination and organize this currency in rubber banded stacks in varying increments to facilitate quick counting;

    l.    That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. The "source" of their income reported on tax returns can be falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

    m.    That drug traffickers commonly maintain addresses or telephone numbers of their associates in the trafficking organization in books or papers and that these traffickers usually maintain this information at their place of residence and/or at the residence(s) of their associates;

    n.    That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product. That these traffickers usually maintain these photographs in their possession and at their place of residence; and

    o.    That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

## PROBABLE CAUSE TO SEARCH

**A.    Summary**

7.    Since late 2019, the DEA, the Michigan State Police ("MSP"), and the MSP-sponsored West Michigan Enforcement Team ("WEMET") have been investigating Saul BRIGGS[1] and other individuals who coordinate drug

---

[1] BRIGGS's criminal history includes state convictions for assault with a dangerous weapon and federal convictions in this Court for possession with intent to distribute cocaine and conspiracy to distribute cocaine. On July 19, 2012, BRIGGS pled guilty to two felonies – conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 846 and

trafficking activities, the movement of bulk cash, and the facilitation of street violence that frequently includes the use of illegal firearms, assaults, and shootings throughout Muskegon and Muskegon Heights, Michigan. This investigation has included several targets who sold drugs both in the Western District of Michigan and elsewhere, including in the Western District of Missouri.

### B. Investigators Identified 2060 Letart Avenue in Muskegon as a Stash House used by BRIGGS and Others to Store Drugs

8. In March 2022, investigators identified the residence at 2060 Letart Avenue in Muskegon, Michigan as a location utilized by BRIGGS and other individuals on a daily basis. Based on physical and electronic surveillance, investigators believed BRIGGS and his associates were utilizing the residence as a drug and/or money stash house.

9. Investigators have maintained physical and electronic surveillance on 2060 Letart Avenue since approximately March 2022. A review of electronic evidence from April 1 to June 2022 has indicated a pattern of activity that investigators believed was indicative of drug trafficking. Specifically, investigators believed BRIGGS and others were utilizing 2060 Letart Avenue to acquire multi-kilogram quantities of fentanyl, and then they

---

841(a)(1), and possession of cocaine with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). *See* Case number 1:12-cr-00123-JTN (WD-MI). On November 1, 2012, BRIGGS was sentenced to 66 months in prison, to be followed by a five-year term of supervised release. On July 8, 2015, the court subsequently reduced BRIGGS's sentence to 60 months pursuant to 18 U.S.C. § 3582(c)(2).

stored the drugs at the residence until they could be broken down into smaller quantities and subsequently distributed to customers.

10.   For example, in April, May, and June 2022, investigators observed, via physical and electronic surveillance, an unknown individual deliver a large brown box to 2060 Letart. Each time, the box appeared to be similar in size to a television box and was brown in color, with no noticeable markings.

11.   After the boxes were delivered in both April and May 2022, investigators observed, via electronic surveillance, an increase in short stay traffic at 2060 Letart Avenue. I know, based on my training, experience, and familiarity with the investigation, that stays of such short duration are indicative of drug trafficking.

12.   Most recently, on June 8, 2022 at approximately 12:21 p.m., investigators observed BRIGGS arrive at 2060 Letart Avenue in a white Dodge Ram truck. BRIGGS then backed into the front driveway of the residence.

13.   At approximately 12:47 p.m., investigators observed a maroon colored sedan arrive at the rear of the residence and park. Investigators then observed an unknown black male exits the driver's side of the vehicle and retrieve a brown box from the rear driver's side of the sedan. The box was similar in size and shape to boxes observed by investigators being delivered to 2060 Letart Avenue in April and May 2022.

14. Based upon this pattern, investigators sought and obtained a search warrant for 2060 Letart Avenue. *See* 1:22-mj-00269. United States Magistrate Judge Sally Berens signed the warrant on June 8, 2022.

15. On June 15, 2022, investigators were conducting surveillance in the area of 2060 Letart Avenue and in other locations relevant to the investigation in and around Muskegon, Michigan. One of these locations was outside of BRIGGS's residence, 1900 Catalina Drive, Apt. 432 ("1900 Catalina"). Investigators believe that BRIGGS resides at 1900 Catalina and has done so for multiple years.

16. On June 15, 2022, at approximately 1:15 p.m., investigators saw BRIGGS at the Lakes Mall in Muskegon. There, BRIGGS met in the parking lot with another individual suspected of conducting illegal drug transactions. After staying at the mall for a short period of time, BRIGGS then drove to 1900 Catalina, where he stayed until approximately 3:30 p.m., when investigators saw him leave 1900 Catalina and drive to 2060 Letart Avenue.

17. Upon BRIGGS's arrival at 2060 Letart Avenue, investigators executed the previously authorized search warrant on the residence. Inside, investigators found distribution level quantities of what I can identify as cocaine, fentanyl, and heroin, as well as a small baggie of suspected crystal methamphetamine. Subsequent TruNarc scans of the drugs were positive for the presence of controlled substances with the following approximate weights: 8,000 grams of a mixture of heroin and fentanyl; 61 grams of cocaine; 774 grams

of black tar heroin; and 22 grams of methamphetamine. Investigators also found cutting agents used to mix drugs for sale, digital scales, multiple empty brown boxes consistent in size and shape with the boxes previously observed being delivered to the residence in April, May, and June 2022, multiple presses used to package drugs for sale, and multiple guns.

18. At the house, investigators also found several pieces of mail addressed to BRIGGS and listing his address as 1900 Catalina Drive, Apt. 432. These pieces of mail included documents from a financial institution and a travel company.

19. Investigators also found mail addressed to BRIGGS and his longtime girlfriend, Sarah Sanders, inside BRIGGS's white Dodge Ram. The mail was addressed to both BRIGGS and Sanders at 1900 Catalina.

20. Finally, when investigators executed the warrant at 2060 Letart, BRIGGS ran out of the house and attempted to flee on foot by jumping over the chain-link fence behind the residence. However, investigators stopped BRIGGS's flight and subsequently took him into custody.

21. Based on the evidence discovered during the search warrant at 2060 Letart Avenue, on June 16, 2022, this Court authorized a criminal complaint charging BRIGGS with three felonies – possession of controlled substances with the intent to distribute them, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and (b)(1)(C); possession of firearms in furtherance of a drug

trafficking crime, in violation of 18 U.S.C. § 924(c); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). *See* 1:22-mj-00279.

### C. BRIGGS's Connections to 1900 Catalina

22. As part of the investigation, law enforcement has also further solidified BRIGGS's connections to 1900 Catalina. For example, we learned that, between March and April 2022 (the time period where law enforcement had a tracker affixed to BRIGGS's white Dodge Ram pursuant to a search warrant signed by United States Magistrate Judge Sally Berens on March 15, 2022, *see* 1:22-mj-00146), BRIGGS's Dodge Ram traveled between 1900 Catalina and 2060 Letart Avenue 27 times. We have also discovered that BRIGGS lists 1900 Catalina as the address for both his CashApp and iCloud accounts.

23. After executing the search warrant at 2060 Letart Avenue, investigators maintained surveillance at 1900 Catalina pending the issuance of a warrant for the residence. At approximately 5:35 p.m. on June 15, 2022, investigators observed a woman identified as Sarah Sanders, BRIGGS's girlfriend, exiting the apartment building at 1900 Catalina through the common door used to access all of the apartments numbering in the 400s. Investigators saw Sanders carrying a large black object, subsequently identified as **Subject Item 1**, which she put in the trunk of her car. Sanders then went back into the apartment building, emerging a few minutes later empty handed.

24. Investigators approached Sanders and began a conversation with her, at which point, she admitted to investigators that **Subject Item 1** was a safe that contained "six bands" – which I know from my training and experience to be code that drug traffickers use for $6,000 in cash. Investigators seized **Subject Item 1** at that time to prevent destruction of evidence pending this application.

25. Sanders also told investigators that she had attempted to remove a second safe from her apartment (which she shares with BRIGGS), subsequently identified as **Subject Item 2**, to her car, but it had been too heavy so she had left it at the top of the stairs in the common hallway of the apartment building. Sanders told investigators that the only item in the second safe (**Subject Item 2**) was BRIGGS's "chain." I know, based upon my work on this investigation, that BRIGGS frequently appears on social media and in pictures wearing a large chain/necklace with a pendant in the shape of the head of a gorilla with the word "BEAST." The chain/necklace appears to be diamond encrusted with a gold chain, as shown in the following photograph, is believed to be highly valuable, and is believed, based on my investigation, to have been purchased with proceeds from illegal drug trafficking:



26.     Investigators subsequently walked inside the common hallway and located **Subject Item 2**, which they seized pending this application to the Court.

## CONCLUSION

27.     Based on the above information, I believe that there is probable cause to search **Subject Item 1** and **Subject Item 2**.

28. Finally, because both **Subject Item 1** and **Subject Item 2** are in law enforcement custody, I request that the Court authorize execution of the warrant at any time of day or night.